Stacy G. Hall, AOH22241
Montana State Prison
700 Conley Lake Road
Deer Lodge, MT 59722

**RECEIVED**

MAR 0 3 2014

CLERK, U.S. DISTRICT COURT
DISTRICT OF MONTANA
HELENA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

( Helena Division )

| | |
|---|---|
| STACY G. HALL, <br> _ Plaintiff, <br><br> Vs. <br><br> MONTANA STATE PRISON, LEROY KIRKEGARD, MYRON BEESON, ROSS SWANSON, TOM WOODS, CANDYCE NEUBAUER, BILLIE REICH, ROXANNE WIGERT, DAN HESS, MICHELE STEYH, sued in their official and individual capacities, and ALVIN FODE, SHEILA HASTINGS, JOHN DOE, JAMES/JANE DOE, TRISDAN KOHUT, sued in their individual capacity, <br>       Defendants. | CS No.: <br> Hon: <br> Mag: <br><br><br> VERIFIED COMPLAINT <br> FOR DAMAGES AND <br> INJUNCTIVE RELIEF <br><br> ( JURY TRIAL DEMANDED ) |

## INTRODUCTION

This is a civil rights action filed by Stacy G. Hall, a state prisoner, for damages and injunctive relief under 42 U.S.C. §1983, alleging violations of his constitutional rights to safety from assaults by a failure on the part of prison personnel to act reasonably in response to a known danger, failure to take corrective action in response to particular patterns of assault, failure to separate rival STG members known to target each other for violence, and the unnecessary and wanton infliction of pain and suffering through a conscious disregard for and the interference with adequate medical care in response to a serious medical condition. The plaintiff also seeks damages under the torts of negligence and medical malpractice.

## JURISDICTION

1. Jurisdiction of this court is invoked

(1)

pursuant to 28 U.S.C. §1331 in that this is a
civil action arising under the Constitution
of the United States; and pursuant to
28 U.S.C. §1343 (a)(3) in that this action
seeks to redress the deprivation, under color
of state law, of rights secured by Acts of
Congress for equal rights secured by persons
within the jurisdiction of the United States.

2. This Court has supplemental jurisdiction over the
plaintiff's state law tort claims under 28 U.S.C.
§1367, and with that regard plaintiff filed an Admini-
strative tort claim concerning the occurrences
complained of on November 12, 2013, of which
the state failed to settle plaintiff's claims.

PARTIES

3. The plaintiff, Stacy G. Hall, was incarcerated
at Montana State Prison ("MSP") located in
Deer Lodge, Montana, during the events
described in this Complaint.

4. Defendant John Doe is a sergeant employed

(2)

at MSP whose name is presently unknown at
this time but who, at the time of the events
giving rise to this complaint, was responsible
for the supervision of all correctional officers
working in High Side Unit 1 ("HSU-1") as
well as the safety and security of all inmates
housed in HSU-1. He is sued in his individual
capacity.

5. Defendant James/Jane Doe is a correctional
officer at MSP whose name is presently
unknown to plaintiff but who, at the time
of the events giving rise to this complaint, was
manning the control cage in HSU-1 that
controlled all doors within the unit as well
as in charge of controlling all inmate
movement within the unit. He/she is
sued in his/her individual capacity.

6. Defendant Alvin Fode is a unit manager
employed at MSP and is responsible for the
overall management, operations, and
security of the housing unit who, at the
time of the events, was responsible for

(3)

Locked Housing Unit Two ("LHU-2") to include supervision of all unit staff, scheduling and training of staff, enforcement of all rules, regulations, training and evaluation of staff. He is also responsible for all inmate classification decisions, job assignments, programming, informal grievance resolutions and classification appeals, as well as minor disciplinary decisions. He is sued in his individual capacity.

7. Defendant Sheila Hastings is a case manager employed at MSP who at the time of the events was assigned to LHU-2. She is responsible for inmate treatment needs, classification monitoring and recommendations, job placement, development of inmate management plans and monthly inmate locked housing status reports, as well as assisting inmates with their program and treatment needs. She is sued in her individual capacity.

(4)

8. Defendant Michele Steyh is employed at MSP as a unit manager and at the time of the events was assigned to HSU-I. As unit manager she is responsible for the overall management, security, and operations of the housing unit. This includes supervising all staff, scheduling and training staff, enforcing all policies and evaluating staff. She is also responsible for the management of the inmate population within the housing unit, all classification decisions, in-house placements of inmates in cell assignments, programming, informal grievance resolutions, classification appeals, job assignments, minor disciplinary decisions, and in-house policies, rules, and regulations related to inmate movements, safety, and security. This includes special attention to the management of the Closed Custody Management Program ("CCMP"). She is sued in her official and individual capacity.

9. Defendant Dan Hess is employed at MSP as a STG Gang Coordinator and is

(5)

responsible for monitoring and coordinating operations to control gang activities within MSP. He is sued in his official and individual capacity.

10. Defendant Roxanne Wigert is employed as a Classification Manager at MSP and is responsible for the over-all management of all classification decisions, providing administrative support to unit managers and preparing reports related to classification appeals to the warden. She is sued in her official and individual capacity.

11. Defendant Billie Reich is employed at MSP as a Grievance Coordinator and Classification Specialist. She is responsible for handling, reviewing, investigating, and responding to inmate grievances as well as providing administrative support for classification decisions. She is sued in her official and individual capacity.

12. Defendant Candyce Neubauer is employed

(6)

At MSP who, at the time of the events, served as bureau chief of classification, disciplinary, and grievance and held responsible for the over-all operations and management of each department. She is also responsible for administrative support for classification decisions. She is sued in her official and individual capacity.

13. Defendant Tom Woods is employed at MSP who, at the time of the events, served as security major responsible for the over-all security of MSP through its policies and operations. He is sued in his official capacity, and individual capacity

14. Defendant Myron Beeson is employed at MSP as Associate warden of housing and is responsible for the supervision of unit managers and over-all operations of the housing units at MSP. He is sued in his official capacity, and individual capacity

15. Defendant Ross Swanson was employed

at MSP at the time of the events as deputy warden and responsible for the over-all operations at MSP. He is sued in his individual and official capacity.

16. Defendant Leroy Kirkegard is employed at MSP as warden and responsible for the custody and care of Plaintiff, as well as the over-all operations at MSP. He is sued in his official capacity, and individual capacity.

17. Defendant Dr. Kohut is employed at MSP as a general medical practitioner. He is sued in his individual capacity.

18. All of the defendants have acted, and with the exception of retired Ross Swanson continue to act, under color of state law at all times relevant to this complaint.

III. EXHAUSTION OF AVAILABLE REMEDIES

19. Plaintiff has exhausted his administrative remedies at MSP before filing this complaint.

(8)

## IV. FACTUAL STATEMENT

20. On February 18, 2009, plaintiff was received at MSP after having been on escape status for thirteen (13) years. He was immediately placed in Maximum Security, Administrative Segregation ("Ad-Seg") for a period of time pending clear conduct.

21. While in Ad-Seg plaintiff associated with inmates on his housing block who were members of a Security Threat Group ("STG") known as Northland Familia, or in general terms as Northerners/Norteños.

22. On August 5, 2009, Plaintiff had received a major disciplinary infraction for his possession of and attempt to pass notes written by STG members. Lt. Dan Hess cited Plaintiff for "4225 - Forming a STG". After being found guilty Plaintiff's stay in Ad-Seg was extended.

23. On August 27, 2009, Plaintiff again

(9)

received a major infraction for "4225 - Participating in STG Activity" for possession of STG written material said to be a note containing the words "Northern (Brown) Pride." Plaintiff's stay in Ad-Seg was again extended.

24. On November 23, 2009, the Unit Management team ("UMT") and Administrative Support Team for Classification decisions completed a Locked Housing Inmate Management Plan taking very serious Plaintiff's possession and passing of STG related material and required Plaintiff to complete in-cell studies on "gang involvement" and "getting away from the gang."

25. On August 24, 2010, after maintaining clear conduct and completing all in-cell studies required of him, Plaintiff was reclassified to Close custody. However, due to concerns he was held in LHU-2 pending a STG review.

26. In mid September of 2010 Plaintiff was met by Lt. Dan Hess for an STG review. Lt. Hess indicated to Plaintiff that he had information claiming that Plaintiff was a ranking member of a California gang known as Nuestra Familia and was actively involved in organizing and structuring MSP's Northerners. Lt. Hess indicated that he had arrived at such a claim through receiving confidential information and after conducting interviews with Northern STG members cooperating with staff. In response and in an effort to prevent Plaintiff from "rallying the troops" as rumored, on September 28, 2010, Plaintiff was transferred to the Crossroads Correctional Center ("CCC") in Shelby, Montana.

27. Prior to Plaintiff's transfer and while in Ad-Seg and Locked Housing Tracy Napier, Professional Development Specialist employed by the Department of Corrections, wrote an article for the Correctional Signpost, 2010, No. 5, beginning on page 9, claiming

(11)

that MSP is experiencing an increase in
violence between the Sureños and their
allied White Supremacists and the Norteños
and their Allied Crips.

28. On January 16, 2010, a major disturbance
occurred between Sureños and Norteños
STG members at the High Support building
on the High Security compound at MSP.

29. In August of 2010 a Northern STG member
sliced the faces of two (2) highly influencial
Sureños STG members. Rumors then began
to circulate that the Sureños were going to
retaliate by killing a high ranking Northerner.
Several Sureños STG members were placed
in Ad-Seg and LHU-2 for conspiring to
retaliate. MSP officials were fully aware
of the pervasive risk of serious assult
that the two STG's posed to each other.

30. While at CCC plaintiff's custody was
increased to Ad-Seg due to disciplinary
actions for fighting and possession of a

(12)

weapon. Though plaintiff was not involved
in any STG activities while at CCC, the
disciplinary actions taken against him were
not STG related, and staff reported that the
plaintiff mostly stayed to himself. Lt. Hart
of CCC validated plaintiff as a Northerner
STG member.

31. Concerned about the safety issues and
stigma attached to inmates validated and
labelled as STG, as well as the arbitrary,
capricious, and erroneous action taken
by Lt. Hart to validate the plaintiff, an
appeal was taken on December 28, 2010.
It was later denied on January 26, 2011,
by Roxanne Wigert who stated that there
is no appeal process available to challenge
STG validations.

32. On June 28, 2011, plaintiff was
returned to MSP from CCC and placed in
LHU-2.

33. On July 20, 2013, plaintiff was

(13)

assigned to an amended locked housing
inmate management plan that called
for a 3 month placement in LHU-2
followed by a 3 month placement in
Close Unit One ("CU-1", closed custody
Management Program ("CCMP").

34. In the month of August, 2011, plaintiff
was moved from B-block in LHU-2 to F-
block where defendant Alvin Fode and
his UMT mixed rivals of various STG's
(mainly Northerners and Southerners).
The social atmosphere was contemptuous
with threats often exchanged between
active STG members. It was rumored
the purpose of housing rivals next to each
other was to allow defendant Alvin
Fode the opportunity to see what would
happen.

35. On August 23, 2011, defendant Alvin
Fode attacked plaintiff with slander-
ous statements after plaintiff defended
inmate Ellenburg who was being accused

(14)

of crossing a line in front of plaintiff's door.
Before the entire block's population defendant
Alvin Fode called the plaintiff a trouble maker
for filing grievances and a P.C. (perfective-
custody) hide out afraid to go to population.
When plaintiff complained that defendant
Alvin Fode was purposely trying to smirch
him in front of everyone defendant Fode
stated, "then why wont you go to population?"
When plaintiff stated that the defendant
knows why he's in locked house, because
of disciplinary reasons related to a fight and
possession of a weapon, defendant Alvin
Fode stated, "Yeah! So you don't get your
ass kicked."

36. As time progressed defendant Alvin
Fode was being reported by inmates as
making references to plaintiff as being a
shot-caller for the Northerner's.

37. While plaintiff was in WU-2 Active
Northern STG members began reporting to
plaintiff that Lt. Dan Hess was referencing

plaintiff as being a high ranking member of Nuestra Familia, a powerful prison gang in California, leading all Northerners at MSP.

38. On October 12, 2011, defendant Alvin Fode asked inmate Richard Nava if he had submitted to plaintiff's authority. Richard Nava, whom plaintiff could clearly over-hear, responded by asking defendant Alvin Fode what was he talking about. Fode stated he had been watching the plaintiff and Nava talking and getting along too well and wanted to know how two Norteño shot-callers work. Fode asked Nava aren't the two of you suppose to be at each others throat. Nava replied by telling Fode to stop trying to cause problems.

39. On October 29, 2011, having no knowledge of CCMP and after hearing inmates in LHU-2 express concerns about the program and how it was being used to transition LHU-2 inmates into general population, plaintiff submitted a grievance protesting the program. Plaintiff's language in the grievance

(16)

clearly indicated that plaintiff was grieving an operational procedure (the use of a disciplinary program, CCMP, as a Locked Housing transition tool and the placement of inmates with clear conduct who are trying to do well in a hostile environment filled with inmates who have current management problems, where plaintiff faces threats that he would be forced to defend against). However, on November 2, 2011, defendant Billie Reich refused to process the grievance by claiming incorrectly that it was an attempt to grieve a classification decision.

40. On November 10, 2011, plaintiff was classified to CCMP. Plaintiff argued against the placement but all fell on deaf ears.

41. On November 15, 2011, defendant Alvin Fode entered plaintiff's housing block to inform inmate Mike Daniels, a Southsider housed in LHU-2 due to threats and

(17)

conspiring to retaliate against the Northerners for the stabbing of Chris Daniels and Levi Daniels, and the plaintiff that their classification to CCMP had been approved. Defendant Alvin Fode told inmate Mike Daniels that he will be leaving in the morning and to be ready. He then told the plaintiff that he wont be leaving for another two (2) weeks to three (3) months due to concerns and the need to make adjustments on CCMP.

42. Plaintiff had no knowledge that CCMP was being dominated by violent Southsider STG members who were current management problems and actively targetting Northerners.

43. On the night of November 16, 2011, an unknown officer in High Side Unit-1 ("HSU-1") entered CCMP and informed the Southsider STG members housed there that the plaintiff was on the movement sheet for CCMP.

44. On November 16, 2011, plaintiff submitted a classification appeal citing his

(18)

concerns about his placement on CCMP.
Within moments after submitting the appeal
defendant Alvin Fode promptly denied the
same. Plaintiff, along with inmate Mike
Daniels, was later escorted to HSU-1 for
placement on CCMP.

45. While in HSU-1 Sgt. John Doe made
housing arrangements.

46. Officer James/Jane Doe, was operating
the HSU-1 control cage, had released two
active Southsider STG members on CCMP
from their cells into the CCMP dayroom.
When inmates are being escorted onto
CCMP all inmates in CCMP are supposed
be locked in their cells for security
reasons. Officer James/Jane Doe failed
to order both inmates to lockdown while
plaintiff and inmate Mike Daniels were being
escorted onto the block.

47. Sgt. John Doe failed to supervise the
movement taking place on CCMP.

(19)

48. While being escorted onto CCMP by A unit correctional officer the two Southsider STG members who were released from their cells and allowed to remain in the dayroom came up from behind the plaintiff and knocked him unconscious using A wooden game board as A weapon. While plaintiff layed unconscious in A growing puddle of his own blood both gang members continued to viciously attack plaintiff by kicking, punching, and hitting him with A weapon.

49. The assault upon the plaintiff resulted in A 3 inch laceration at the base of plaintiff's skull which required 12 staples to close and A concussion in the back of plaintiff's brain, A 1½ inch laceration to the front of plaintiff's skull requiring 7 staples to close and A concussion in the front of plaintiff's brain, numerous cracked and bruised ribs on the right side of plaintiff's body, as well as injuries to plaintiff's right hand and right knee. The assault was so severe that plaintiff was drifting in and

( 20 )

out of consciousness and at one point became delusional.

50. Plaintiff was taken via an ambulance to the Deer Lodge Medical Center for X-Rays. Medical staff at the center attempted to perform a CT scan but due to plaintiff's delusional state he believed the machine was going to slice him into thin pieces and began to struggle on the back board he was strapped to.

51. Recognizing plaintiff's state of shock and as suffering from delusions medical staff attempted to sedate him with medications in order to perform the CT scan. Believing staff were attempting to poison him plaintiff refused the medication.

52. After standard X-Rays were taken (to insure plaintiff's neck and back were not broken) he was returned to MSP and admitted to the prison infirmary for care and treatment of his numerous serious

(21)

injuries to his skull, brain, ribs and back.

53. The assault on plaintiff resulted in his hospitalization at the prison infirmary for a period of six (6) days beginning on November 16, 2011, and ending on November 21, 2011. During that time plaintiff suffered problems with his equilibrium and thought processes, as well as severe pain as the result of serious injury to his skull, brain, ribs and back.

54. When plaintiff was admitted to the prison infirmary he was placed in a single man isolation cell that contained only a mechanical hospital (medical) bed, a call button, and an all-in-one sink/toilet. He was administered pain medications at some point and visited at bed-side regularly throughout the remainder of the day and night by medical staff until the next morning

55. At some point on the morning of November 17, 2011, security staff began to restrict access

to plaintiff by medical staff and required
plaintiff to submit to restraints before they
would allow medical staff access to care
for and treat plaintiff.

56. In order to submit to restraints as required
before medical care and treatment were
allowed to be administered plaintiff had to
physically lift himself up and hop down from
the hospital bed, whose mattress was above
plaintiff's hip level, walk over to the cell
door, bend down to a hatch in the door,
place his hands through the hatch to be
hand cuffed, walk back to the bed, hop up
onto the bed and remain seated while
medical staff were allowed in. After medical
conducted their routine medical check-up
and treated plaintiff he had to repeat the
activity to have the restraints removed.

57. Plaintiff complained of severe pain
caused by the activity and that his muddled
condition made it dangerous and difficult
for him to hop in and out of bed and move

( 23 )

around without assistance... plaintiff had to
use the bed for support to prevent himself
from falling down because of dizziness
due to troubles with his equilibrium.

58. Due to plaintiff's trouble with his
equilibrium caused by his brain injuries
he was prescribed medication to help
with dizziness but still required to
submit to restraints in the manner
previously described.

59. Plaintiff continued to suffer trouble
with his speech, thought processes, pain,
and maintaining consciousness for more
than 2 to 3 hours at a time. He slept
for 18 to 20 hours per day for the first
3 to 4 days, waking only for meals and
when called to submit to restraints.

60. On November 18, 2011, plaintiff sought
the assistance of Grievance Coordinator
Billie Reich to file a grievance related
to the use of excessive restraints as

previously described. The grievance was denied at all levels of the administrative process.

61. Also on November 18, 2011, plaintiff sought the assistance of Grievance Coordinator Billie Reich to file a second grievance alleging staff misconduct for the failure to protect by placing plaintiff in a situation that subjected him to substantial danger and excessive risk to his safety, by placing him on a close-custody housing block dominated by known rival STG members targeting Northerners.

62. Per prison policy No. 3.3.3 the only action that can be granted to resolve a staff misconduct grievance is an investigation. That action was granted thus exhausting the grievance process on that issue.

63. On November 21, 2011, after Dr. Trisdan Kohut's return to MSP he discharged plaintiff

(25)

from the infirmary and dramatically reduced
pain medications. When plaintiff complained
about his condition and severe pain Dr. Kohut
stated that plaintiff is not dieing and his
condition now is only a matter of comfort
and for that reason there is no need to keep
plaintiff in the infirmary or maintain the
current level of pain meds.

64. After plaintiff complained to Dr. Kohut
about his attitude towards plaintiff's
suffering defendant Kohut told plaintiff
to tough it out.

65. Plaintiff was immediately thereafter
removed from the infirmary and forced to
walk in sub-freezing conditions from the
infirmary to Locked Housing Unit 2 wear-
ing only a medical gown and plastic slippers,
where plaintiff was placed in detention.

66. Almost immediately after placement in
detention plaintiff complained of being
tortured by the conditions of detention and

(26)

of severe pain. Completely ignoring plaintiff's
suffering with pain a nurse answered his
medical kite by recommending ice for the
treatment of plaintiff's back and hand, that
plaintiff breath deeply (which caused severe
spikes in pain) and walk when possible
(which he found difficult due to dizziness
and problems with his equilibrium), and
get rest.

67. Because plaintiff was being housed in
detention, ice was restricted and therefor
not made available to him. He was forced
to suffer through his pain without any care
and under the extreme conditions imposed
in detention. These conditions composed
of 24 hours locked isolation in a small
cell stripped of all items except a 2" inch
hard mattress that caused plaintiff to suffer
more pain, a thin pillow that offered no
elevation, sheets, two worn blankets in bad
condition, an all-in-one toilet and sink, and
insufficient heat.

68. Because of the outside sub-freezing conditions and lack of adequate heat in plaintiff's cell his window had a build-up of ice inside the cell making it so cold that plaintiff shivered all the time, which caused him to suffer more severe head aches and pain in his back and ribs, and difficulty breathing.

69. On November 22, 2011, plaintiff was moved from detention to general population. For the days, weeks, and months that followed plaintiff continued to suffer pain in his back and ribs, migraine head aches, and trouble w. th his thought processes where he found it difficult to identify by name common objects such as a toothbrush, trouble with his equilibrium, speech (slow and slurred), and his ability to quickly understand the happenings around him and keep his concentration focused.

70. On November 25, 2011, plaintiff was seen by defendant Dr. Trisdan Kohut regarding plaintiff's complaints of migraine head-aches and severe pain in his back and ribs.

(88)

Plaintiff also brought to Dr. Kohut's attention a severe break-out of hives that covered plaintiff's back, sides, and buttocks.

71. After looking over plaintiff's body, inspecting the staples in his head, and running his hand over plaintiff's back defendant Dr. Trisdan Kohut explained that the staples will be removed by his nurse, that he believed the hives is eczema (later proved false), that the plaintiff can expect pain in his back and ribs for up to six (6) weeks, and that his migraine head aches will eventually go away as his concussions heal. Dr. Kohut further went on to explain that plaintiff's trouble with his equilibrium, speech, and cognition will also improve in time but offered no treatment.

72. When plaintiff asked about pain management defendant Dr. Trisdan Kohut stated that he does not treat pain because it's a matter of comfort and not life or death, and that prison is not meant to be a comfortable place for inmates. He stated he would prescribe Ibuprofin for

(29)

swelling and Hydrocortisone for the hives. He
stated nature will heal the rest as time passes
then instructed his nurse to remove the staples
from plaintiff's head.

13. The plaintiff continued to suffer migraine head
aches, severe pain in his back and ribs, and com-
plications with his speech, memory, thought
processes and equilibrium for the days and weeks
that followed without any follow-up care or
monitoring by medical staff. The plaintiff also
suffered additional pain from shivering all the
time due to a problem with the housing unit's
heating system during sub-zero conditions. On
December 29, 2011, plaintiff submitted a health
care request asking for follow-up care.

14. Plaintiff was seen by a nurse that same day
who stated that MSP does not treat inmates for
pain except for what is available on the canteen
or through the sergeant in the housing unit
(over the counter medications). The nurse also
explained that at MSP it's the inmate's responsi-
bility to monitor his progress and request

(30)

follow-up care using the medical request kite system. Plaintiff was instructed to continue taking Ibuprofin and to re-kite in 3 months if his condition still persists or becomes worse.

75. Plaintiff's issues with his speech, memory, thought processes and equilibrium didn't return to normal until some time in February of 2012. He still suffers headaches and migraines, as well as short-term memory lapses. The pain in his back and ribs did not resolve until sometime in June of ~~the~~ 2012, with occassional back aches that remain persistent.

76. In June of 2012 plaintiff began to experience numbness in his ~~right~~ left calf. He reported the condition to MSP medical who noted the problem but did not investigate further. Plaintiff was later seen by defendant Dr. Trisdan Kohut who merely explained the problem as a condition of old age.

77. In March of 2013 plaintiff began to experience additional numbness in his arms when he sits

(31)

or lays down. On March 12, 2013, the plaintiff
complained to MSP medical who followed-up
with a basic assessment (questioning) by a
Registered Nurse who merely recommended
that plaintiff stretch and exercise. When the
plaintiff explained that he stretches and exercises
daily the nurse instructed plaintiff to continue
doing what he was doing and to re-kite MSP
medical if his condition doesn't improve. No
tests were ordered nore was the plaintiff
referred to a doctor for further investigation.

78. After plaintiff's condition with numbness
in his left calf and both arms and pain in his
upper back continued to persist, on April 16,
2013, he complained to MSP medical and asked
if his condition could be related to the injuries
he sustained from the November 2011 assault.
The plaintiff was assessed and referred to
defendant Dr. Trisdan Kohut. Dr. Kohut ordered
X-rays and a blood test looking for arthritis.

79. After the X-rays and a blood test failed to
allow for an explanation defendant Dr. Trisdan

(32)

Kohut opined that plaintiff's condition was due to old age that he'll have to learn how to live with. Defendant Dr. Kohut denied plaintiff's request for additional tests to find the cause of his condition.

80. As of the date of this complaint's filing plaintiff continues to suffer from periodic migraine head-aches, trouble with his short term memory and memory lapses, as well as chronic pain and paresthesias into his right ring and small finger.

81. The only form of treatment recommended to treat plaintiff's continued and chronic condition is over-the-counter Ibuprofin and exercising, which has no effect on plaintiff's issues with numbness and pain but does seem to reduce the intensity of his migraine head-aches when taking Ibuprofin.

IV. CLAIMS FOR RELIEF

A. Deliberate Indifference To Inmate Safety:

(33)

81. The practice of defendants Leroy Kirkegard, Myron Beeson, Tom Woods, Ross Swanson, Candyce Neubauer, and Roxanne Wigert of adopting policies which create conditions that are dangerous to the safety of identified groups of prisoners associated with STG rivals known to target one another for assault, a fact of which each defendant knew personally and collectively, or should have known from a series of persistent and pervasive events within MSP and from the well established reputation of the rivalry between the STG's at MSP identified as Northerners and Southerners, created an excessive risk of danger to plaintiff's safety, especially when each defendant had personal knowledge of the plaintiff's STG associations, by housing him together with STG rivals in close-custody violated plaintiff's Eighth Amendment right to be free from deliberate indifference to his safety and further constituted a failure to protect

82. As a result of defendants Leroy Kirkegard,

(34)

Myron Beeson, Tom Woods, Ross Swanson, Candye Neubauer, and Roxanne Wigert's practice, plaintiff was viciously assaulted and received serious physical and emotional injuries.

83. The failure of defendants John Doe, Alvin Fode, Sheila Hastings, Michele Steyh, Dan Hess, Roxanne Wigert, Billie Reich, Candyce Neubauer, Ross Swanson, Tom Woods, Myron Beeson, and Leroy Kirkegard to separate rival STG members known to target one another for assault from being housed together in close-custody unnecessarily placed plaintiff in a situation of a high risk of danger to his safety in violation of his Eighth Amendment right to be from deliberate indifference and/or reckless disregard to excessive risks of danger to personal safety and further constituted a failure to protect.

84. As a result of John Doe, Alvin Fode, Sheila Hastings, Michele Steyh, Dan Hess, Roxanne Wigert, Billie Reich, Candyce

Neubauer, Ross Swanson, Tom Woods, Myron
Beeson, and Leroy Kirkegard's failure, plaintiff
was viciously assaulted and received serious
physical and emotional injuries.

85. Defendants Sgt. John Doe, Alvin Fode,
Sheila Hastings, Michele Steyh, Dan Hess,
Roxanne Wigert, Billie Reich, Candyce Neubauer,
Tom Woods, Myron Beeson, and Ross Swanson
individually and collectively acted with
reckless disregard for plaintiff's safety by
placing him on CCMP while having actual
knowledge that the same was being dominated
by rival STG's members deemed to have
current behavioral and management problems,
and who posed an excessive risk to plaintiff's
safety, in violation of plaintiff's Eighth
Amendment right to be free from excessive
risks of danger to safety.

86. As a result of defendants Sgt. John Doe,
Alvin Fode, Sheila Hastings, Michele Steyh,
Dan Hess, Roxanne Wigert, Billie Reich,
Candyce Neubauer, Tom Woods, Myron

(36)

Beeson, and Ross Swanson's reckless disregard for excessive risks of danger to plaintiff's safety, plaintiff was viciously assaulted and received serious physical and emotional injuries.

87. Defendants Sgt. John Doe, Alvin Fode, Sheila Hastings, Michele Steyh, Dan Hess, Roxanne Wigert, Billie Reich, Candyce Neubauer, Tom Woods, Myron Beeson, and Ross Swanson all acted individually and collectively with reckless disregard for plaintiff's safety by failing to make adjustments on CCMP to secure plaintiff's safety before placing him on CCMP while having actual knowledge that rival STG members being housed on CCMP posed an excessive risk of danger to plaintiff's safety, in violation of his Eighth Amendment right to be free from excessive risks of danger to personal safety.

88. As a result of defendants Sgt. John Doe, Alvin Fode, Sheila Hastings, Michele Steyh, Dan Hess, Roxanne Wigert, Billie Reich, Neubauer,

(37)

Tom Woods, Myron Beeson, and Ross Swanson's failure, plaint. ff was viciously assaulted and received serious physical and emotional injuries.

B. Deliberate Indifference to Serious Medical Condition:

89. The practice of defendants Tom Woods, Myron Beeson, Ross Swanson, and Leroy Kirkegard of adopting a policy that requires a prisoner being held in a medical isolation cell within the prison, regardless of the seriousness of the prisoner's physical injuries, to submit to restraints in a manner which the seriously injured prisoner must lift himself up and move to the cell door where he must contort his body in order to make his hands available through a small hatch in the door before medical staff will be allowed in to treat the prisoner, which by reason of plaintiff's serious physical injuries, battered body, and brain concussions he complained he was unable to perform without suffering severe pain and which placed him in a situation of excessive risk of danger of

(38)

suffering additional injuries, violated plaintiff's
Eighth Amendment right to be free from deliberate
indifference to his serious medical condition
and need for care.

90. As a result of defendants Tom Woods, Myron
Beeson, Ross Swanson, and Leroy Kirkegard's
practices, plaintiff's safety was endangered
and he was compelled to perform physical
activities which caused the unnecessary and
wanton infliction of severe physical and
emotional pain and suffering.

91. The failure of defendant Ross Swanson to
allow prison medical staff to enter plaintiff's
medical isolation cell within the prison
infirmary without requiring plaintiff to
physically submit to restraints before opening
the prison cell door, a process which the
plaintiff complained caused him severe
pain and placed him at risk of suffering
additional injuries, violated plaintiff's
Eighth Amendment right to receive medical
care without interference or deliberate

(39)

indifference to his serious medical condition.

92. As a result of defendant Ross Swanson's failure, plaintiff's safety was endangered and he was compelled to perform physical activities which caused the infliction of severe physical and emotional pain and suffering.

93. The failure of defendant Dr. Trisdan Kohut to provide continuous and effective pain relieving medication for the plaintiff while he was suffering severe chronic pain, or the reduction in pain relieving medication to levels that were not effective in treating plaintiff's severe pain, violated his Eighth Amendment right to be free from deliberate indifference to his serious medical condition and need for adequate medical care and treatment.

94. As a result of defendant Dr. Trisdan Kohut's failure or reduction of level of treatment, the plaintiff suffered the unnecessary infliction

of severe physical and emotional pain.

95. The failure of defendant Dr. Trisdan Kohut to inquire further into, perform additional tests, and treat, plaintiff's onset of chronic migraine headaches, back pain, and later the development of numbness in his left calf and chronic paresthesias into his right ring and small finger, as well as defendant Dr. Trisdan Kohut's hostile and dismissive attitude towards plaintiff's need for care as being a condition of old age that the plaintiff must learn to live with, and the defendant's conscious choice to adopt less efficacious treatment, violates plaintiff's Eighth Amendment right to be free from deliberate indifference to his serious medical condition and need for adequate medical care and treatment.

96. As a result of defendant Dr. Trisdan Kohut's failures and his hostile and dismissive attitude plaintiff suffered prolonged pain and permanent injury.

C. Negligent Failure To Protect:

97. Defendants Leroy Kirkegard, Ross Swanson, Myron Beeson, Tom Woods, Candyce Neubauer, Billie Reich, Roxanne Wigert, Dan Hess, Michele Steyh, Sheila Hastings, Alvin Eode, Sgt. John Doe, C.O. James/Jane Doe each owed Plaintiff a duty of reasonable care to protect him from assaults by other prisoners.

98. Defendants Leroy Kirkegard, Ross Swanson, Myron Beeson, Tom Woods, and Candyce Neubauer breached that duty by failing to institute policies that separates rival STG members known to target one another, and/or members of an identifiable group of prisoners for whom the risk of assault was a serious problem.

99. Defendants Leroy Kirkegard, Ross Swanson, Myron Beeson, Tom Woods, and Candyce Neubauer further breached that duty by adopting policies of housing rival STG

(42)

members, and/or members of an identifiable group of prisoners for whom the risk of assault was a serious problem, together in close-custody.

100. Defendants Leroy Kirkegard, Ross Swanson, Myron Beeson, Tom Woods, and Candyce Neubauer individually and/or collectively acted with negligent and reckless disregard for inmate safety by creating policies and instituting practices that housed inmates with current disciplinary and behavioral problems together in Close-Custody (CCMP) with inmates who had no behavioral or management problems and who were attempting to earn access to greater program opportunities, thus placing inmates without management problems in a position to defend and protect themself from actively aggressive and disruptive inmates.

101. Defendants Sgt. John Doe, Alvin Fode, Sheila Hastings, Michele Steyh, Dan Hess, Roxanne Wigert, Billie Reich, Candyce Nuebauer, Tom Woods, Myron Beeson, and Ross Swanson

(43)

individually and collectively acted negligently and
with reckless disregard for plaintiff's safety
by placing him on CCMP while having actual
knowledge that the same was being used to
house rival STG members deemed to have current
behavioral, disciplinary, and management
problems And when each defendant knew, or
should have known, posed an excessive risk to
plaintiff's safety.

102. Defendants Sgt. John Doe and Michele Steyh
individually and collectively acted negligently and
with reckless disregard for plaintiff's safety,
after having actual knowledge that rival STG
members to that of the plaintiff were being
housed on CCMP and that such a condition posed
an excessive risk of danger of assault, by
failing to make adjustments on CCMP to reduce
the risk of danger CCMP posed to plaintiff's
safety.

103. Defendant Alvin Foote acted negligently
and with reckless disregard for plaintiff's
safety by failing to insure adjustments on

CCMP were made in response to his actual knowledge of the excessive risk of danger that rival STG members posed to plaintiff's safety before transferring plaintiff from LHU-2 to CCMP.

104. Defendant Sgt. John Doe acted negligently by failing to supervise correctional staff under his supervisory control while plaintiff was being placed on CCMP.

105. Defendants Michele Steyh and Sgt. John Doe individually and collectively acted negligently in their failure to adequately train correctional staff under their supervisory control into the policies and procedures related to the control of movement on CCMP.

106. Defendant James/Jane Doe acted negligently and with reckless disregard for plaintiff's safety by failing to follow operational policies and procedures related to the control of movement on CCMP by allowing CCMP inmates to remain in the dayroom while

(45)

plaintiff was being escorted onto CCMP to his cell assignment.

107. Defendants Dan Hess and Alvin Fode acted negligently and with reckless disregard for plaintiff's safety by placing him at an increased risk of danger by rival STG's by communicating to inmates that the plaintiff is a high ranking member of a California STG and a shot-caller for the Northerners at MSP.

108. The breach of duty by the above named defendants resulted in serious physical and emotional injury and damages.

109. The breach of duty by each defendant proximately caused those damages.

D. Medical Negligence and Malpractice

110. Defendant Dr. Trisdan Kohut negligently and deliberately through willful and wanton conduct caused plaintiff to suffer a recovery of lesser extent or quality by inflicting and subjecting

(46)

plaintiff to severe prolonged pain by ordering a
reduction of pain management medication to such
inadequate levels that treatment became
ineffective.

111. Defendant Dr. Trisdan Kohut negligently and
deliberately, through willful and wanton conduct,
caused plaintiff to suffer increased severe pain
by ordering his removal from the prison's
infirmary care without making necessary
arrangements for proper bedding and room
temperature, thus subjecting plaintiff to the
harsh conditions of laying on a 2" thick hard
matress on cement, in room temperatures that
caused plaintiff to shiver, while knowing that
such conditions are likely to increase pain and
prolong plaintiff's suffering given the battered
condition of his physical injuries.

112. Defendant Dr. Trisdan Kohut acted negligently
and with callous disregard for plaintiff's health
by failing to perform or even recommend
appropriate diagnostic tests for plaintiff's
medical condition and his complaints of:

(47)

(a) chronic migraine headaches;
(b) numbness in plaintiff's left calf;
(c) severe and prolonged back pain;
(d) short term memory problems and memory
lapses; and
(e) chronic pain and paresthesias into plaintiff's
right ring and small finger.

113. The negligent acts of defendant Dr. Trisdan
Kohut resulted in additional injuries and a
recovery that is of lesser extent or quality or
that takes longer to occur.

114. Defendant Dr. Trisdan Kohut's negligent
acts proximately caused those damages.

VI. RELIEF REQUESTED

WHEREFORE, plaintiff requests the following relief:

A. Issue a declatory judgment stating that:
 1. The practice of defendants Leroy Kirkegard,
    Myron Beeson, Tom Woods, Ross Swanson,
    Candyce Neubauer, and Roxanne Wigert of

(48)

adopting policies and practices which create dangerous conditions to the safety of identified prisoners by housing rival STG members together in close-custody violated the plaintiff's rights under the Eighth Amendment to the United States Constitution and constituted a failure to protect under state law.

2. The failure of defendants John Doe, Alvin Fode, Sheila Hastings, Michele Steyh, Dan Hess, Roxanne Wigert, Billie Reich, Candyce Neubauer, Ross Swanson, Tom Woods, Myron Beeson, and Leroy Kirkegard to separate plaintiff from rival STG members by housing him together with rival STG members in close-custody unnecessarily placed the plaintiff at a high risk of danger to his safety which violated his rights under the Eighth Amendment to the United States Constitution and constituted a failure to protect under state law.

3. Defendants John Doe, Alvin Fode, Sheila Hastings, Michele Steyh, Dan Hess,

Roxanne Wigert, Billie Reich, Candyce
Nuebauer, Tom Woods, Myron Beeson,
and Ross Swanson acted with reckless
disregard for plaintiff's safety by
placing him on CCMP at a time when
the housing block was being used to
house rival STG members who pre-
sented themself as current disciplinary
and STG management problems, which
violated plaintiff's rights under the
Eighth Amendment to the United States
Constitution and constitutes a
failure to protect under state law.
4. Defendants John Doe, Alvin Fode, Sheila
Hastings, Michele Steyh, Dan Hess, Roxanne
Wigert, Billie Reich, Candyce Nuebauer,
Tom Woods, Myron Beeson, and Ross
Swanson acted with reckless disregard
for plaintiff's safety by failing to make
adjustments on CCMP that would reduce
the excessive risk of danger to plaintiff's
safety pose by rival STG members on
CCMP, which violated plaintiff's Eighth
Amendment rights and constituted a
(50)

failure to protect under state law.

5. Defendants Tom Woods, Myron Beeson, Ross Swanson, and Leroy Kirkegard's practice of adopting and instituting policies which interfere with medical treatment and completely disregards pain and suffering by requiring prisoners with serious physical injuries and head trauma, who are hospitalized in a secure prison infirmary, to submit to restraints in a manner which inflicts and exasperates pain and suffering, and places the injured at risk of suffering additional injuries, violated plaintiff's rights under the Eighth Amendment to the United States Constitution and constitutes excessive use of restraint and/or force under state law.

6. Defendant Ross Swanson's failure to allow prison medical staff to enter plaintiff's secure prison medical isolation cell without requiring plaintiff to physically submit to restraints, which plaintiff complained caused him severe pain

(51)

and which placed plaintiff at risk of suffering additional injuries, violated plaintiff's rights under the Eighth Amendment to the United States Constitution and constituted excessive use of restraint and/or force under state law.

7. Defendant Dr. Trisdan Kohut's failure to provide adequate medical care for the plaintiff violated, and continues to violate, the plaintiff's rights under the Eighth Amendment to the United States Constitution and constitutes medical malpractice under state law.

B. Issue an injunction ordering Leroy Kirkegard and his agents to:

1. Immediately arrange for plaintiff to be examined by a qualified medical practitioner with expertise in the treatment of post concussion brain injuries.

2. Carry out without delay the treatment directed by such medical practitioner.

3. Immediately arrange for plaintiff to be

(52)

examined by a qualified medical practitioner
with expertise in the diagnosis and
treatment of numbness in the legs, and
pain and paresthesias of the fingers.
4. Carry out without delay the treatment
directed by such medical practitioner
5. Provide the standard of care as law
mandates under §27-1-716, MCA.

C. Issue an injunction ordering Leroy Kirkegard
and his agents to:
1. Develop procedures in the classification
system that separates prisoners who
are associated with identifiable groups
(STG's) known to be rivals and/or who
target each other with violence.
2. Develop prisoner housing procedures
which separates prisoners associated
with identifiable groups (STG's) known
or reported to be rivals and/or who
target each other with violence, from
being housed together in close
quarters, the same general living area
(such as a cell block), and in the

(53)

same cell.

D. Award compensatory damages jointly and
severally against:
  1. Defendants Leroy Kirkegard, Ross Swanson,
Myron Beeson, Tom Woods, Candyce
Neubauer, Roxanne Wigert, Billie Reich,
Dan Hess, Alvin Fode, Michele Steyh,
Sheila Hastings, John Doe, and James/
Jane Doe for the physical and emotional
injuries sustained as a result of the
factors in plaintiff's vicious beating
  2. Defendant Dr. Kohut for the physical pain
and emotional injuries resulting from his
failure to provide adequate medical care
for the plaintiff.
  3. Defendants Leroy Kirkegard, Ross Swanson,
Myron Beeson, and Tom Woods for the
physical pain and emotional injuries
resulting from their adopting policies
and practices that deliberately interfere
with adequate medical care

E. Award punitive damages in the following

Amounts:

1. $5,000.00 each against defendants John Doe and James/Jane Doe.

2. $10,000.00 each against defendants Leroy Kickegard, Ross Swanson, Myron Beeson, Tom Woods, Candyce Nuebauer, and Billie Reich.

3. $15,000.00 each against defendants Dan Hess, Alvin Fode, Michele Steyh, and Sheila Hastings.

4. $25,000.00 against defendant Dr. Tristan Kohut.

F. Grant such other relief as it may appear the plaintiff is entitled.

DATED this 11ᵗʰ day of February, 2014.

Respectfully submitted,

Stacy G. Hall

Stacy G. Hall, AO# 22241
700 Conley Lake Road
Deer Lodge, MT 59722

(55)

Declaration of Verification

STATE OF MONTANA )
                 ) : ss
COUNTY OF POWELL )

Pursuant to 28 U.S.C. 1746, I, Stacy G. Hall,
plaintiff in the above entitle cause, hereby
declare (or certify, verify, or state) under
penalty of perjury that the facts stated in
the foregoing VERIFIED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF are
true to my knowledge, and that the facts
stated on information and belief are true
to the best of my knowledge and belief.
DATED this 11th day of February ____, 2014.

Stacy G. Hall

STACY G. HALL



VERA HOSCHEID
NOTARY PUBLIC for the
State of Montana
Residing at Anaconda, Montana
My Commission Expires
March 28, 2016



VERA HOSCHEID
NOTARY PUBLIC for the
State of Montana
Residing at Anaconda, Montana
My Commission Expires
March 28, 2016

(56)