IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| STACY HALL, | CV 14-00011-H-DLC-JTJ |
| Plaintiff, | |
| vs. | |
| LEROY KIRKEGARD, MIKE MAHONEY, ROSS SWANSON, MYRON BEESON, LEONARD MIHELlCH, TOM WOOD, CANDYCE NEUBAUER, ROXANNE WIGERT, BILLIE REICH, DAN HESS, MICHELE STEYH, ALVIN FODE, SHEILA HASTINGS, WILLIE JOHNSON, AND NIKKIE LORELLO,[1] | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| Defendants. | |

The following motions are pending:  Mr. Hall's Motion to Compel

Discovery (Doc. 82); Defendants' Motion for Protective Order (Doc. 91); Mr.

Hall's Motion for Sanctions (Doc. 103); Defendants' Motion for Summary

Judgment (Doc. 111); Mr. Hall's "Motion for an Order upon Defendants to

Comply with Rule 33(b)(3) and (5), Fed.R.Civ.P. on the Matter of Supplemental

Answers to Their Interrogatories" (Doc. 131); Mr. Hall's "Request for Magistrate

---

[1]The case caption has been amended pursuant to the filing of the Second Amended
Complaint as directed by Judge Christensen.  (Doc. 65.)

Judge's Instruction Related to Evidence Used in Support of Opposition Brief to

Defendants' Motion for Summary Judgment" (Doc. 134); Defendants' Motion to

File Exhibit 46 under Seal (Doc. 142); and Mr. Hall's Motion to Strike Portions of

Defendants' Reply on Motion for Summary Judgment (Doc. 145).

The motion for summary judgment should be granted.  All other motions

will be denied except for Mr. Hall's motion for sanctions.  Defendants will be

required to pay the costs of the mediation in this case.

# I.     MOTION FOR SUMMARY JUDGMENT

## A.  Summary Judgment Standard

Summary judgment is appropriate when the moving party "shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice,

"[t]he moving party initially bears the burden of proving the absence of a genuine

issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.

2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving

party may accomplish this by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials" or by showing that such

materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586-87 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"  *Anderson*, 447 U.S. at 248.

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  But it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586

(citations omitted).

Mr. Hall has requested that Defendants' Motion for Summary Judgment be denied pursuant to Rule 56(d) of the Federal Rules of Civil Procedure which provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

To prevail on a Rule 56(d) request, a party must make "(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." *Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (9th Cir. 2004) (citation omitted). "The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Id.* at 1129-30 (citation omitted). A district court may "deny[ ] further discovery if the movant has failed diligently to pursue discovery in the past, or if the movant fails to show how the information sought would preclude summary judgment." *Id.* at 1130 (citation omitted).

5

By notice provided July 13, 2016 (Doc. 115), Mr. Hall was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

### B. Facts

Mr. Hall is a prisoner of the Montana Department of Corrections but he has been housed at the South Dakota State Penitentiary under an interstate transfer agreement since December 9, 2014. (Statement of Undisputed Facts, Doc. 112 ("SUF") at ¶¶ 1. 107.)

Mr. Hall was transferred from California to MSP in February, 2009. (SUF at ¶ 35.) He was disciplined for Security Threat Group (STG)/gang activity in August and September, 2009 but denies that he was engaged in STG activities. (SUF at ¶ 36; Statement of Disputed Facts, Doc. 138 ("SDF") at ¶ 36.) MSP's STG Coordinator/ Manager, Dan Hess, validated Mr. Hall as a Norteno associate on September 8, 2010. (SUF at ¶ 37.) Although not listed in the statement of undisputed facts, the parties acknowledge there was a gang/STG rivalry at MSP between the Northerners/Nortenos and the Southerners/Surenos. (2nd Amd. Comp., Doc. 66 at 16, ¶ 85; Hess discovery responses, Doc. 83-2 at 24; Steyh discovery responses, Doc. 83-2 at 45; Fode discovery responses, Doc. 83-2 at 67;

Hastings discovery responses, Doc. 83-2 at 95; Johnson discovery responses, Doc. 83-2 at 107; Hess Affidavit, Doc. 92-2 at 7, ¶ 20.)

Defendants contend that Mr. Hall's ties to the Nortenos and his STG activities were well-known to MSP officials through information and intelligence gathered from reliable confidential informants, inmates and staff at MSP, and other contracted facilities.  (SUF at ¶ 38.)  Mr. Hall denies he was engaged in STG activities.  (SDF at ¶ 38.)

Mr. Hall was transferred to Crossroads Correctional Center ("CCC") in Shelby, Montana, on September 28, 2010.  (SUF at ¶ 39.)  He was returned to MSP on June 28, 2011, at the request of officials at CCC, due to his STG association with the Nortenos and the fact that the only place available to house Mr. Hall in close custody (high side general population) at CCC already housed four Surenos.  (SUF at ¶ 42.)  Upon his return to MSP, Mr. Hall was placed in maximum custody in Close Unit 3 (CU3).  (SUF at ¶ 43.)

Mr. Hall was reclassified to the Close Custody Management Program (CCMP) in November 2011.  The CCMP was implemented by MSP officials in 2010 to transition inmates who had been in locked housing back into high side general population.  (SUF at ¶ 44.)  The CCMP consisted of a single block located in High Side Unit 1 (HSU1).  (SUF at ¶ 47.)   The CCMP block had 12 cells and

could house 12-24 inmates. (SDF at ¶ 48.)  In the CCMP block, inmates' custody levels were stepped down gradually from locked housing (Ad Seg or Max custody), to close custody general population, as they maintained clear conduct and essentially proved they could get along with other inmates.  (SDF at ¶ 49.)

The CCMP had a 3-level system.  In 2011, Level 1 inmates on the CCMP block would initially eat their meals in their cells and have an hour of dayroom and yard by themselves for a period of 15-30 days.  If they maintained clear conduct and achieved level 2 (30-45 days), they were allowed to eat their meals in the dayroom and share an hour of dayroom and yard with one or more CCMP inmates.  Level 3 was the last segment of an inmate's time in the CCMP (15-30 days).  Level 3 inmates were allowed to eat their meals in the chow hall and go to yard with other general population inmates in HSU1.  (SUF at ¶ 51.)  Yard and dayroom periods were one hour per day and were rotated according to schedules. (SUF at ¶ 52.)

HSUl Unit Manager Michele Steyh was responsible for the day-to-day operation of the CCMP block and made all cell assignments and picked dayroom partners by cell, e.g., cells 1 and 2 had dayroom together, 3-4, 5-6, 7-8, etc.  (SUF at ¶ 53.)  She also prepared the dayroom and yard schedules for the CCMP inmates, thus controlling how many people were in the dayroom at the same time.

8

(SUF at ¶ 54.)

Mr. Hall was classified to the CCMP by his unit manager in CU3, Defendant Alvin Fode, and case manager, Defendant Sheila Hastings (Gillibrand)[2], on November 10, 2011, after completing all requirements of his locked housing unit plan.  (SUF at ¶ 61.)  Mr. Hall was recommended for the CCMP because he had been in locked housing since his return to MSP in February, 2009 and MSP officials were trying to transition him out of locked housing and into close custody general population.  (SUF at ¶ 58.)

Mr. Hall submitted a grievance dated October 19, 2011 complaining about the CCMP program.  He complained it was more restrictive than the lowest levels of locked housing, and allegedly mixed bad inmates with good, i.e., inmates with recent behavior problems with inmates who had maintained clear conduct.  Mr. Hall noted he had maintained clear conduct in locked housing in the months prior to his classification to CCMP.  The grievance did not mention housing rival gang members together.  (SUF at ¶ 59.)

The Administrative Review Committee (ARC) was a committee at MSP

---

[2]At all times relevant to the incidents at issue, Sheila Hastings' name was Hastings.  She remarried in November 2013 and her last name is now Gillibrand.  As she was named as Sheila Hastings and Mr. Hall knows her as Sheila Hastings, the Court will refer to her as Defendant Hastings in this Order.

whose function was to review and approve or disapprove inmate classification and housing placement decisions presented to them by the unit management team.  The ARC reviewed Mr. Hall's classification at their weekly meeting on November 15, 2011.  (SUF at ¶ 62.)  Among others in attendance at the meeting were Defendants Neubauer, who served as a member of the ARC; Roxanne Wigert, who was there in her role as classification specialist to ensure the accuracy of the classification reports and present them to the ARC; STG coordinator Hess, who attended to advise the ARC and unit management teams about STG matters; and CUl/HSUl Unit Manager, Michele Steyh, who routinely attended ARC meetings at that time to staff, or discuss, all STG inmates coming into HSUl and specifically CCMP. (SUF at ¶ 64.)

Steyh had learned at staffings that Mr. Hall was a Norteno.  She was aware that three Sureno inmates (Inmates Rides Horse, Younkin, and Wassmer) were also housed on the CCMP block in November 2011.  She determined her unit management team could manage any risk to Mr. Hall because she was not aware of any specific threat to him posed by these inmates and because the inmates on the CCMP were for the most part locked down and trying to maintain clear conduct so they could go to general population.  (SUF at ¶ 65.)

The ARC approved Mr. Hall's classification to CCMP on November 15,

2011.  (SUF at ¶ 68.)  He was placed on the movement sheet the evening of November 15, 2011, by administrative staff in the MSP Count Office.  The daily movement sheet is prepared in the evening after many Prison employees have left for the day.  (SUF at ¶ 69.)

Also on November 15, 2011, Vera Hoscheid, case manager for HSUl, the unit to which Mr. Hall was being moved, wrote an incident report documenting a conversation at 10:45 a.m. between two inmates in HSUl, William Younkin and Chris Michelotti.  These two inmates were talking to each other through the doors of their respective blocks, Upper C block (the CCMP block) and Upper D block. Hoscheid wrote an incident report because CCMP inmates were not allowed to talk to inmates in other blocks through their block doors.  CCMP inmates were segregated from other inmates in HSUl.  (SUF at ¶ 70.)

Hoscheid wrote a second incident report on November 15, 2011, documenting a conversation she had with a confidential informant ("CI") that afternoon.  The CI told Hoscheid that Mr. Hall was going to refuse his classification to CCMP and that inmates in CUI (HSUl) were waiting for Mr. Hall. When Hoscheid asked the CI who the inmates were, the CI stated he could not say. He then told Hoscheid it did not have anything to do with him, it had to do with Mr. Hall and his problems with the Surenos.  (SUF at  ¶ 71.)

Hoscheid felt this incident report was vague because the CI refused to identify the inmates who were "waiting" for Mr. Hall.  In addition, the CI did not specifically tell Hoscheid that inmates were waiting for Mr. Hall on the CCMP block rather he said inmates in HSUl, i.e., the unit as a whole, were waiting for Mr. Hall.  (SUF at ¶ 72.)  Hoscheid did not consider this report to be urgent because Mr. Hall going to CCMP where the inmates would be largely locked down and their movement controlled.  (SUF at ¶ 74.)

When Hoscheid prepared the incident report, she was not aware that Mr. Hall's classification to CCMP had been approved by the ARC that day or that his name would be on the movement sheet that evening.  (SUF at ¶ 75.)  Hoscheid took the two incident reports, along with any others she had written that day, to the Command Post at about 5:00 p.m. on November 15, 2011 as she left work.  (SUF at ¶ 76.)  It was the duty of the shift commander in the Command Post to determine the distribution of each incident report and ensure copies were distributed accordingly.  (SUF at ¶ 77.)  Hoscheid's two November 15, 2011, incident reports were distributed by the first shift commander, Lieutenant Matt Saville, on November 16, 2011.  (SUF at ¶ 78.)

Warden Kirkegard's first day at MSP was November 16, 2011 and he gave a speech that morning.  (SUF at ¶ 79.)  All Defendants except Mike Mahoney, who

12

was retired, and security staff who remained in the units (Johnson and Lorello),

attended Warden Kirkegard's speech in the Wallace Building at 8:30 a.m.  (SUF at

¶ 89.)

Deputy Warden Swanson is the only Defendant who saw the November 15,

2011 Hoscheid incident report about her conversation with the confidential

informant prior to Mr. Hall's assault on the morning of November 16, 2011.  (SUF

¶ 108.)  Like Hoscheid, Deputy Warden Swanson felt the report was vague.  He

did not believe the report contained contain sufficient information to initiate

separation needs, because it did not identify the inmates who posed a threat to Mr.

Hall.  (SUF at ¶ 81.)  Swanson concluded that while the report contained enough

information to require the HSUl unit management team and STG Coordinator to

investigate the threat, Mr. Hall was in no immediate danger because he was going

to CCMP, where the inmates were locked down.  Swanson was not aware Mr.

Hall's classification had been approved the previous day or that Mr. Hall was on

the movement sheet.  (SUF at ¶ 83.)

Inmates Younkin and Rides Horse (both Surenos) were released to the

CCMP dayroom at 8:00 a.m. on November 16, 2011, for an hour by the cage

officer, Defendant Lorello, in accordance with the CCMP dayroom schedule.

(SUF at ¶ 87.)  At 8:22 a.m., Sergeant Willie Johnson took the mail and paperwork

from HSUl to the Command Post, as he did every morning at about that time. (SUF at ¶ 88.)

Mr. Hall was escorted from CU3 to HSUl, along with another inmate, Mike Daniels.  Mr. Hall and Inmate Daniels arrived in the unit at 8:32 a.m.  (SUF at ¶ 90.)  Mr. Hall and Inmate Daniels were escorted into the CCMP block (Upper C) at 8:41 a.m. by Corrections Officer ("CO") Bruno Kraus.  (SUF at ¶ 91.)

Cage officer Lorello did not lock down Inmates Younkin and Rides Horse when Mr. Hall and Inmate Daniels were walked onto the block.  (SUF at ¶ 92.)  As Mr. Hall and Inmate Daniels were walking onto the block, CO Kraus turned to ask cage officer Lorello which cells were Mr. Hall's and Inmate Daniels'.  When he did, Inmate Rides Horse swung a wooden cribbage board at Mr. Hall, hitting him in the head.  Mr. Hall fell to the floor and curled up in the fetal position as Inmates Rides Horse and Younkin hit and kicked him.  (SUF at ¶ 93.)  CO Kraus ran over to Mr. Hall and stood over him, fending off Inmates Rides Horse and Younkin's blows.  In so doing, CO Kraus was hit and kicked by Inmates Rides Horse and Younkin.  (SUF at ¶ 94.)

The assault ended when at 8:43 a.m. Mr. Hall stood up and CO Kraus shoved him into an empty cell and shut the door.  Inmates Rides Horse and Younkin beat on the door and yelled "Southside!" until they were subdued,

14

handcuffed, and escorted off the block by corrections officers.  (SUF at ¶ 95.)

Inmates Rides Horse and Younkin were criminally charged for the assault on Mr. Hall.  Inmate Rides Horse pled guilty to aggravated assault and assault on a police officer.  Inmate Younkin plead guilty to accountability for aggravated assault.  (SUF at ¶ 112.)

After the assault Mr. Hall was restrained and escorted to the Prison Infirmary.  (SUF at ¶ 96.)  He was then taken to the Deer Lodge Medical Center, where CT scans of his head, c-spine, and abdomen were performed, along with x-rays of his ribs.  All were negative for fractures.  (SUF at ¶ 97.)  Mr. Hall was diagnosed with a closed head injury, contused ribs, and head lacerations.  He received 10-12 staples for a laceration in the back of his head and eight staples for a laceration to the front of his head.  He was then returned to MSP.  (SUF at ¶ 98.)

Upon his return to MSP, he was admitted to the Infirmary, where he stayed from November 16 through 21, 2011.  (SUF at ¶ 99.)  Mr. Hall submitted an informal grievance on November 18, 2011 complaining about the use of restraints on him in the infirmary.  Specifically he requested that he not be required to cuff up to have access to medical staff.  (Grievance, Doc. 112-41.)  Infirmary staff responded to Mr. Hall's grievance, stating:  "Mr. Hall custody level dictates security level, you are currently close III custody which means you need to be

handcuffed before staff enter your cell.  We will try to be as gentle as possible during this process." *Id.*  He submitted a formal grievance on November 22, 2011 on the same issue and the response indicated that he was a CIII custody inmate and they were abiding by the policies and procedures set in place.  (Doc. 112-41 at 3.)

Mr. Hall appealed the denial of his grievance on December 29, 2011. Defendant Swanson denied the appeal on February 9, 2012.  Mr. Hall appealed to the DOC Director on February 17, 2012.  The appeal was denied on February 24, 2011.  (SUF at ¶ 106.)  In a February 21, 2012 e-mail to Director Ferriter, Kristy Cobban indicated that the restraint protocols were followed because Mr. Hall was in CU3 at the time.  (Cobban e-mail, Doc. 112-41 at 9.)

## C. Allegations

Mr. Hall raises claims of deliberate indifference to his safety based upon MSP housing policies and Defendants' classification and placement of Mr. Hall in a pod with rival gang members and deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.  He also raises state law negligence claims.  (2nd Amd. Cmplt., Doc. 66.)

## D. Analysis

### 1. Eighth Amendment–Failure to Protect

"Prison officials have a duty to take reasonable steps to protect inmates

from physical abuse." *Hoptowit v. Ray*, 682 F.2d 1237, 1250-51 (9th Cir. 1982);

*see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Robinson v. Prunty*, 249

F.3d 862, 866 (9th Cir. 2001).  In particular, prison officials have an affirmative

duty to protect inmates from violence at the hands of other inmates.  *Farmer*, 511

U.S. at 833.

The failure of a prison official to protect inmates from attacks by other

inmates or from dangerous conditions at the prison violates the Eighth

Amendment only when two requirements are met:  (1) the objective

component—the deprivation alleged must be sufficiently serious, and (2) the

subjective component—the prison official must possess a sufficiently culpable

state of mind.  *Farmer*, 511 U.S. at 834 (*citing Wilson v. Seiter*, 501 U.S. 294, 298

(1991).  The inmate may satisfy the "sufficiently serious" requirement by showing

the existence of "conditions posing a substantial risk of serious harm."  *Farmer*,

511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).  "The objective

question of whether a prison officer's actions have exposed an inmate to a

substantial risk of serious harm is a question of fact, and as such must be decided

by a jury if there is any room for doubt."  *Lemire v. California Dep't of Corr. &*

*Rehab.*, 726 F.3d 1062, 1075–76 (9th Cir. 2013) (citation omitted).

To meet the subjective component, a prisoner must establish that prison

17

officials were "deliberately indifferent" to serious threats to the inmate's safety. *See Farmer*, 511 U.S. at 834.  A prison official can be held liable under the Eighth Amendment for failing to guarantee the safety of a prisoner if they know of and disregard an excessive risk to an inmate's health or safety.  *See Farmer*, 511 U.S. at 837.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  *See id.*  Deliberate indifference describes a state of mind more blameworthy than negligence.  *See Farmer*, 511 U.S. at 835 (*citing Estelle*, 429 U.S. at 104).  Neither negligence nor gross negligence will constitute deliberate indifference.  *See Farmer*, 511 U.S. at 835–36 & n. 4; *see also Estelle*, 429 U.S. at 106 (establishing that deliberate indifference requires more than negligence).

There are generally two ways to establish a failure to protect claim.  The first is if a defendant disregarded evidence of a specific threat.  Mr. Hall argues Defendants failed to respond to a particular threat to his safety when no action was taken to stop Mr. Hall's transfer to CCMP after the November 15, 2011 Hoscheid incident report.  Defendants argue they were not deliberately indifferent by not immediately responding to this report.  The Court agrees with Defendants.

The Hoscheid incident report was issued on or about 4:00 p.m. the evening prior to the assault on Mr. Hall.  It was put in for distribution at 5:00 p.m.  The

18

report was only seen by Defendant Swanson prior to the assault on Mr. Hall which

occurred at approximately 8:30 a.m. the following morning.  Mr. Hall cannot,

however, establish deliberate indifference for failing to act on this report because

there is no evidence Swanson was aware Mr. Hall was being transferred to CCMP

that day.  Swanson indicates he felt the report needed to be investigated but he did

not see it as an urgent matter because he was not aware of when Mr. Hall would be

transferred and Mr. Hall was going to CCMP where inmates are locked down.

(Swanson Aff., Doc. 112-5 at 4.)

Mr. Hall failed to demonstrate that Defendants were deliberately indifferent

for failing to take immediate action with regard to the Hoscheid incident report.

The second manner of establishing a failure to protect claim is to

demonstrate that Mr. Hall was assaulted as a result of prison conditions or

practices that are dangerous to all prisoners or to any identifiable groups of

prisoners.  As set forth in *Farmer*,

> The question under the Eighth Amendment is whether prison
> officials, acting with deliberate indifference, exposed a prisoner to a
> sufficiently substantial risk of serious damage to his future health and
> it does not matter whether the risk comes from a single source or
> multiple sources, any more than it matters whether a prisoner faces an
> excessive risk of attack for reasons personal to him or because all
> prisoners in his situation face such a risk.

*Framer*, 511 U.S. at 843.  Mr. Hall alleges he was assaulted because the

19

Defendants failed to separate him from rival gang members housed in Close Custody, placed him on CCMP knowing it was dominated by rival gang members, and failed to make adjustments to CCMP to secure his safety from rival gang members, before placing him there.  (2nd Amd. Cmplt., Doc. 66 at ¶¶ 97-92.)

Defendants argue that policies allowing members of different gangs to be housed together is not per se an Eighth Amendment violation.  *Labatad v. CCA*, 714 F.3d 1155, 1160 (9th Cir. 2013) ("The number of gang members housed . . . and the high representation of certain gangs would place an unmanageable burden on prison administrators were they required to separate inmates by gangs"), *citing Mayoral v. Sheehan*, 245 F.3d 934, 939 (7th Cir. 2001).  (Brf, Doc. 114 at 17.) The Court agrees.  The Ninth Circuit has held that even housing inmates of opposite gangs in the same cell with each other, with nothing more, fails to satisfy the Eighth Amendment's standard that prison officials must be aware of a specific risk to an inmate.  *Labatad*, 714 F.3d at 1160.

However, Defendants could still be liable if they were deliberately indifferent to a substantial risk of harm caused by housing of rival gang members together.

Mr. Hall points to several pieces of evidence to support his argument that Defendants were on notice that inmate members of rival gangs could not be safely

20

housed together and therefore they were deliberately indifferent to his safety when they placed him in CCMP on November 16, 2011.  First, he presented evidence of several incidents of violence or conflict between Nurenos and Surenos between 2008 and 2012.  (Strizich Aff. Doc. 137-2 at ¶¶ 6, 10, 11, 16, 18, 29, 30, 39; Hall Aff., Doc. 138-1 at 72, ¶ 121; Wood Aff. ¶ 9.; SUF ¶ 111; Doc. 137-2 at 66 List of HSU1 incidents.)  He also argues there are numerous other incidents which Defendants refused to produce in discovery and which are the subject of his motion to compel.  He argues there was so much animosity between the gangs that Defendants should have known that placing him in a pod with a number of Surenos would place him at substantial risk of serious harm.

Secondly, Mr. Hall presented evidence that Inmate Jory Strizich met personally with MSP Grievance coordinators Billie Reich and Kristy Cobban and expressed concerns related to CCMP including his concern over housing rival STG's actively targeting each other together on CCMP especially Northerners and Southerners.  (Strizich Aff., Doc. 137-2 at 2.)

Third, Mr. Hall testified that during the assault on November 16, 2011 he remembers Inmate Younkin yelling at the officers saying that he warned Shelly Steyh not to put any "Crumps" on the block with him or this would happen, and that maybe now she will listen and take the threat more seriously."  (Hall Aff.,

Doc. 138-1 at ¶ 158.)

The Court acknowledges that there are multiple outstanding discovery issues in this matter which are the subject of Mr. Hall's motion to compel and his request to stay ruling on the motion for summary judgment pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. But Mr. Hall has not shown that even if the outstanding discovery exits, it would prevent summary judgment. *See Emprs Teamsters*, 353 F.3d at 1129-30. Mr. Hall's own admissions defeat his claims.

Placing Mr. Hall in general population with a number of Surenos or placing him in the same cell as a rival gang member may have been a cause for concern but the CCMP was a locked down unit similar to the locked housing unit that Mr. Hall occupied prior to being transferred to CCMP. Mr. Hall was housed on F block from August 17 to November 16, 2011. (Hall Aff., Doc. 138-1 at ¶ 134.) He testified that while he was on that housing block, Defendant Fode moved "some of the highest and most influential Southerners at MSP onto F Block including Levi Daniels and Mike Daniels, Jesse Remmel." (Hall Aff., Doc. 138-1 at ¶ 137.) If Mr. Hall had been safely housed on F Block with some of the "highest and most influential Southerners" at MSP for three months without incident, then Defendants were not deliberately indifferent to Mr. Hall's safety by moving him to CCMP where although he would be housed with Surenos he would

22

be locked down.

Ms. Steyh testified that she knew Mr. Hall was a Norteno and that Inmates Rides Horse, Younkin, and Wassmer were Surenos that were housed on the CCMP block on November 16, 2011.  She considered this information and determined that her unit management team could manage any risk to Mr. Hall because she was not aware of any specific threat to him posed by these inmates, and because the inmates on the CCMP were for the most part locked down and trying to maintain clear conduct so they could go to general population.  (SUF at ¶65.)

In response to Mr. Hall's interrogatory requests, Defendant Dan Hess indicated that he was aware that Mr. Hall was going to be placed in CCMP, so he went to talk with Alvin Fode, Mr. Hall's unit manager at the time, because Mr. Hall was a known Norteno associate and Mr. Hess knew there were Surenos housed on the CCMP block.  UM Fode told Hess there was no specific threats to Mr. Hall in going to CCMP, and Mr. Hess was aware that some separation and balance between Nortenos and Surenos could be maintained on the CCMP block just as it is throughout the prison.  (Hess Interrogatory Response 13, Doc. 83-2 at 29.)

Because Ms. Steyh and Mr. Hess considered this information and made the decision that Mr. Hall could be safely housed on CCMP indicates a lack of

23

deliberate indifference.  Mr. Hall had been safely housed on F block with numerous Surenos in the three months prior to his classification to CCMP.  Like F block, CCMP was a locked housing unit where Mr. Hall would have been locked down for the majority of the day and was supposed to have had little if any interaction with the other inmates on the block at least for the first month while on that unit.  Given that Mr. Hall had been safely housed with Surenos on F block, moving him to the more restrictive CCMP was not deliberately indifferent.  Mr. Hall was moved from one locked housing unit with Sureno inmates to another locked housing unit with Sureno inmates.  This was not deliberate indifference.

There may be outstanding discovery relevant to whether or not there were risks associated with housing rival gang members together.  But even if Mr. Hall could demonstrate that there was significant animosity and conflict between the Surenos and Nurenos at MSP in November 2011, he cannot show that Defendants were deliberately indifferent to his safety by placing him in a locked housing unit even if there were rival gang members on that unit.  He had just come from a housing unit with Surenos and had not been attacked.  Mr. Hall has not demonstrated that any named Defendant was deliberately indifferent for placing him in a locked housing unit with rival gang members.

Under § 1983, "an individual may recover only when that individual's

24

federal rights have been violated." *Quintanilla v. City of Downey*, 84 F.3d 353,

356 (9th Cir. 1996).  As a result, when there is no underlying constitutional

violation, a plaintiff cannot maintain a claim for municipal liability.  *Id.* (*citing*

*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)(stating "[i]f a person has

suffered no constitutional injury at the hands of the individual police officer, the

fact that the departmental regulations might have authorized the use of

constitutionally excessive force is quite beside the point").  Because Mr. Hall has

failed to establish that he suffered an underlying constitutional violation, he

cannot maintain a claim against the supervisory officials for their own actions or

for the policies which they may have established.

Even if could establish a constitutional violation, Mr. Hall has not

established that any Defendant violated a clearly established right.  He failed to

identify any case which would put Defendants on notice that they should not have

moved him to CCMP.  The cases he cited are easily distinguishable.  In *Mooring*

*v. San Francisco Sheriff's Dept.*, 289 F.Supp.2d 1110, 1117 (N.D. Cal. 2003), the

district court found that even assuming that housing a Norteno gang member with

a Soreno gang member in general population cell would be inherently and

unacceptably dangerous, Mr. Mooring failed to demonstrate that the defendant

knew or should have known of that risk.  In *Mooring*, the plaintiff was housed in a

general population cell in California, not in a locked housing unit like CCMP.

In *Walsh v. Mellas*, 837 F.2d 789 (7th Cir. 1988), the Seventh Circuit upheld the trial court's finding of deliberate indifference for placing the plaintiff in the same cell with a gang member where gang activity was a serious security problem in the prison, that problem was known by the two defendants, and the plaintiff was, and was known to be such a targeted inmate and therefore a member of an identifiable group of prisoners for whom risk of assault was a serious problem.

In *Rodriguez v. Connecticut*, 169 F.Supp.2d 39 (D.Conn. 2001), the district court determined there was a material issue of fact regarding whether Defendants were deliberately indifferent for housing allegedly rival gang members in the same cell together.

In *Miller v. Shelby County, Tenn*, 93 F.Supp.2d 892 (W.D. Tenn. 2000), the district court found defendants liable for allowing inmates at different security level to take recreation together.  The *Miller* court found that defendants were deliberately indifferent because the plaintiff had repeatedly expressed his concern that he was a target of gang violence, defendants were on notice that the offending inmates posed a physical threat to other inmates, and despite this knowledge defendants allowed the inmates to take recreation together.

26

In *Jensen v. Clarke*, 94 F.3d 1191 (8th Cir. 1996), the Eighth Circuit discussed the risks of double celling inmates without assessing compatibility.

In contrast to all of these cases, Mr. Hall was not housed in the same cell or in a general population area with rival gang members.  He was placed in a locked housing unit with rival gang members.  The distinction is critical.  Mr. Hall cannot show that it was clearly established that Defendants would be deliberately indifferent to his safety by moving him from one locked housing unit where he was housed with Surenos without incident to another locked housing unit where he would be housed with rival gang memebers.  The cases cited by Mr. Hall all deal with situations where an inmate was placed in general population or in the same cell with rival gang members.  Those are not the facts in this case.

Mr. Hall's argument that the prison failed to follow their own rules, regulations or policies (Doc. 137 at 26) is also unavailing.  *See Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (alleged failure to follow prison policy does not establish federal constitutional violation).

Summary judgment should be granted to all Defendants on Mr. Hall's federal failure to protect claim.

## 2.  Eighth Amendment–Deliberate Indifference to Medical Needs

Mr. Hall alleges,

27

The practice of defendants Tom Wood, Leonard Mihelich, Myron Beeson, Ross Swanson, and Mike Mahoney, as continued by Leroy Kirkegard, of adopting a policy that requires a prisoner being held in a medical isolation cell within the prison, regardless of the seriousness of the prisoner's physical injuries, to submit to restraints in a manner which the seriously injured prisoner must lift himself up and move to the cell door, where he must contort his body in order to make his hands available through a small hatch in the door before medical staff will be allowed in to treat the prisoner, which by reason of plaintiffs serious physical injuries, battered body, and brain concussions he complained he was unable to perform without suffering severe pain and which placed him in a situation of excessive risk of danger of suffering additional injuries, violated plaintiffs Eighth Amendment right to be free from deliberate indifference to his serious medical condition and need for care.

(Amd. Cmplt., Doc. 66 at 18, ¶ 93.)

To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (*citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis.  First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was

deliberately indifferent. *Jett*, 439 F.3d at 1096. This second prong is met if the prisoner demonstrates (1) a purposeful act or failure to respond to a prisoner's medical need and (2) harm caused by the indifference. *Id.* Prison officials are deliberately indifferent if they deny, delay, or intentionally interfere with medical treatment. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

The Eighth Amendment duty to provide medical care applies to medical conditions that may result in pain and suffering which serve no legitimate penological purpose. *Estelle*, 429 U.S. at 103. "The infliction of unnecessary suffering is inconsistent with contemporary standards of decency . . ." *Id.*

Defendants argue that due to his custody level, Mr. Hall was required to be restrained when staff had direct contact with him regardless of his location in the Prison, including the infirmary, for safety reasons. (SUF at ¶ 100.)[3] They point to the Locked Housing Operations Policy, MSP 3.5.1, which provided:

> Unit staff will restrain every inmate who is moved out of a cell per procedures outlined in the post orders. Exceptions may be allowed when the inmate is in a secure enclosure, (such as a recreation area, shower, cell, dayroom, etc.), when the inmate is performing a work detail, or when a physician, physician assistant or nurse practitioner deems it medically necessary. In cases of emergency treatment,

---

[3]Attached to their reply brief, Defendants submitted ten pieces of new evidence. The Court will not consider this evidence because Mr. Hall has not had an opportunity to respond. *See Provenz v. Miller,* 102 F.3d 1479, 1483 (9th Cir. 1996)(new evidence in reply may not be considered without giving the non-movant an opportunity to respond).

> escorting officers will only remove restraints when requested by the
> chief medical officer and only to the degree necessary to
> accommodate treatment.  In this event escort officers will remain with
> the inmate at all times.

(MSP 3.5.1, III(D)(4), Doc. 112-40 at 4-5.)[4]

Contrary to Mr. Hall's argument, the policy does take into account the seriousness of the prisoners' physical injuries because it allows an exception if a physician, physician's assistant, or nurse practitioner deems it medically necessary to remove restraints.  (MSP 3.5.1(III)(D)(4), Doc. 112-40 at 6.)  As such, there can be no liability based upon the policy itself.

Mr. Hall named Defendants Tom Wood, Leonard Mihelich, Myron Beeson, Ross Swanson, Mike Mahoney, and Leroy Kirkegard in this claim.  However, he produced insufficient evidence to create a genuine issue of fact regarding each individual's liability on this issue.[5]

Although Mr. Hall complained to a number of individuals regarding his treatment in the infirmary between November 16, 2011 and November 21, 2011, there is no evidence that Defendants Wood, Mihelich, Beeson, Swanson or

---

[4]Mr. Hall objects to this evidence as the policy cited was revised October 25, 2013 which is after the incidents at issue.  The policy in effect at the time was submitted with Defendants' reply brief (see footnote 1 above).  There are no differences in the substance of the quoted portion of this policy.

[5]Mike Mahoney had been retired from the prison since July 2011 and cannot be held liable for this claim.

Kirkegard were made aware of the situation prior to Mr. Hall's release from the infirmary on November 21, 2011.  In fact, they presented undisputed testimony that they had no notice or knowledge of the specifics of Mr. Hall's custody and care while he was a patient in the MSP infirmary following the November 16, 2011 assault.  (Kirkegard Aff., Doc. 112-3 at ¶ 10; Swanson Aff., Doc. 112-4 at ¶ 13; Beeson Aff., Doc. 112-6 at ¶ 6; Mihelich Aff., Doc. 112-7 at ¶ 6; Wood Aff., Doc. 112-8 at ¶ 12.)

Mr. Hall disputes these representations and argues that when he complained about the use of restraints against him, he was told the Wardens were aware of the situation and had approved the use of restraints.  (Hall Aff., Doc. 138-1 at ¶ 176.) This however, is hearsay evidence.  Hearsay is an out-of-court statement offered to prove the truth of the matter asserted.  Fed. R. Evid. 801.  Mr. Hall is seeking to offer an out-of-court statement to prove that the Wardens approved the use of restraints on Mr. Hall while he was in the infirmary.  Information contained in an inadmissible form may still be considered for summary judgment but only if the information itself would be admissible at trial.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (*citing Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the

31

party satisfies the requirements of Federal Rules of Civil Procedure 56.")); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony.") There is no indication that Mr. Hall could present this testimony in an admissible form at trial.  He does not even indicate who made the statement.

Mr. Hall argues that Defendants knew or should have known their own policies, that Mr. Hall had been assaulted, that he was taken to the local hospital, and had been admitted to the prison infirmary.  Therefore, he argues Defendants would have known Mr. Hall would be subjected to the conditions imposed by their policies and procedures.  But even if Defendants knew Mr. Hall was in the infirmary, there is no evidence that they were made aware that Mr. Hall was suffering excessive pain as a result of their policy.  They could rely on the policy that if medically necessary as determined by medical staff, Mr. Hall would not need to be restrained.

Mr. Hall also attempts to create a genuine issue of fact first by arguing that he was not a locked housing inmate while he was in the infirmary.  He argues the restraint policy did not apply to him while he was in the infirmary between

32

November 17, 2011 and November 21, 2011 because he was classified to close custody as CCMP requires.  (Doc. 137 at 78.)  The November 10, 2011 classification summary indicates that his custody status was decreased to CUI CCMP.  (Doc. 112-32.)  Yet the responses to Mr. Hall's grievances in November and December 2011 regarding this issue all indicate that he had to be restrained because he was Close III custody.  (Doc. 112-41.)[6]

There is an issue of fact regarding whether the restraint policy should have been applied to Mr. Hall while he was in the infirmary but that issue is not material again because there is no evidence that Defendants Wood, Mihelich, Beeson, Swanson or Kirkegard were made aware of the situation.  Deliberate indifference requires a showing of a purposeful act or failure to respond to a prisoner's medical need.  *Jett*, 439 F.3d at 1096.  There is no evidence that these Defendants were aware that Mr. Hall was suffering.

_____

[6]Defendants presented a number of pieces of evidence regarding this claim in their reply. Again, the Court will not consider this evidence without giving Mr. Hall an opportunity to respond.  In addition, Mr. Wood makes unsupported statements in his affidavit regarding Mr. Hall's custody status without evidentiary support that seem to contradict other evidence in the record.  For example, Mr. Wood testified that, "Mr. Hall was placed in the infirmary on PHC-CD status on 11/16/2011 at 1635 hours.  He was moved to CUIII, still on PHC-CD status on 11/21/2011 at 1050 hours.  He was taken off CD status and returned to close custody status on 11/22/2011 at 1258 hours."  Clearly, Mr. Wood did not have specific recollection of this information and yet there is no reference to any evidence in the record to support this statement. In addition, the responses to Mr. Hall's grievances in November and December 2011 regarding this issue seem to contradict Mr. Wood's testimony because they all indicate that Mr. Hall had to be restrained because he was Close III custody.  There is no mention of PHC-CD status in the grievance responses.  (Doc. 112-41.)

Summary judgment should be granted to all Defendants on Mr. Hall's federal deliberate indifference to serious medical needs claim.

### 3. Negligent Failure to Protect

"Negligence is the failure to use the degree of care that an ordinarily prudent person would have used under the same circumstance." *Barr v. Great Falls International Airport Authority*, 107 P.3d 471, 477 (Mont. 2005). The common and statutory law of Montana impose a general duty upon every person to exercise ordinary and reasonable care.

> Except as otherwise provided by law, each person is responsible not only for the results of the person's willful acts but also for an injury occasioned to another by the person's want of ordinary care or skill in the management of the person's property or person except so far as the person has willfully or by want of ordinary care brought the injury upon the person.

Mont.Code Ann. § 27–1–701.

A cause of action for negligence requires the plaintiff to prove four essential elements: "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached that duty, (3) the breach was the actual and proximate cause of an injury to the plaintiff, and (4) damages resulted." *Peterson v. Eichhorn*, 189 P.3d 615, 621 (Mont. 2008).

Defendants assert that Mr. Hall's negligence claims fail because they are not

supported by expert testimony.  They argue that under the circumstances of this case expert testimony is required to establish: (1) the applicable standard of care Defendants owed to Mr. Hall; (2) how Defendants breached that standard of care; and (3) how Defendants' conduct caused Mr. Hall's injuries.

Expert witness testimony is required in certain negligence cases to establish the elements of duty, breach, and causation when those issues are "sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding the evidence." *Dubiel v. Montana Department of Transportation*, 272 P.3d 66, 70 (Mont. 2012); *Tin Cup County Water and/or Sewer District*, 200 P.3d 60, 69 (Mont. 2008) (concluding expert opinion testimony was required where the issues of causation were "beyond the common experience and understanding" of lay jurors).  As the Montana Supreme Court has stated:

> Under Montana law, expert testimony is required to establish the standard of care unless the conduct complained of is readily ascertainable by a layman.  We have reasoned that because juries composed of laymen are normally incompetent to pass judgment on questions of whether "reasonable care" was exercised in undertaking work calling for a special skill, there can be finding of negligence in the absence of expert testimony to support it.

*Brookins v. Mote*, 367 Mont. 193, 292 P.3d 347 (Mont. 2012)(internal citations and quotations omitted).

35

Individuals who are engaged in a profession and those who undertake work calling for special skill are required not only to exercise reasonable care in the conduct of their affairs but also must possess a standard minimum of special knowledge and ability referred to as the "standard of care." *Doble v. Lincoln County Title Co.*, 215 Mont. 1, 4, 692 P.2d 1267, 1268 (1985) (*citing William L. Prosser, Law of Torts*, pp. 161–62 (4th ed., 1971)).  Because the standards of care applicable in a negligence action against a professional or one involved in a skilled trade are outside the common experience and knowledge of lay jurors, Montana law recognizes that expert testimony is required to establish the standard of care.  This requirement has been extended to negligence actions against medical doctors, dentists, orthodontists, veterinarians, lawyers, manufacturers of pharmaceuticals, abstractors of title, and professional counselors.  *Carlson v. Morton*, 229 Mont. 234, 239, 745 P.2d 1133, 1136–1137 (1987); *Newville v. Department of Family Services*, 267 Mont. 237, 257, 883 P.2d 793, 805 (1994) (professional counselors); *Zimmerman v. Robertson*, 259 Mont. 105, 107–08, 854 P.2d 338, 339–340 (1993).

The parties do not cite to any Montana case requiring expert testimony to establish the standard of care in negligence actions against prison officials. Defendants cite several cases from the District of Columbia for the proposition

36

that "[t]he question of whether prison officials acted reasonably to secure the safety of an inmate is not one within the realm of the everyday experiences of a lay person." *District of Columbia v. Moreno*, 647 A.2d 396, 399 (D.C. App. 1994) citing *Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C. 1981). The District of Columbia's highest court has "repeatedly held that the standard of care owed by the District of Columbia to persons in its custody is a matter beyond the ken of the average juror that requires expert testimony." *Clark v. District of Columbia*, 708 A.2d 632, 634 (D.C. 1997). No such rule exists in Montana, however, and there is thus no basis for this Court to conclude that a Montana court would decide that the standard of care owed to persons in custody must in all circumstances be considered "sufficiently beyond the common experience of the trier of fact."

Several federal courts and other state courts, however, in analyzing similar state law provisions have found that expert testimony is required to prove negligence claims against correctional facilities/officials in failure to protect negligence cases. *See e.g., Gordon v. Kitsap County*, 2015 Wash. App. LEXIS 981, at *7-*8, 2015 WL 2124383 (Wash. Ct. App. May 5, 2015) (nurse assaulted by an inmate was required to produce expert testimony to establish the appropriate standard of reasonable care needed for handling inmates because it was a

37

specialized issue that involves interrelated issues of jail security, inmates'

constitutional rights, and statutory compliance); *Porter v. Arizona Dep't of Corr.*,

2012 U.S. Dist. LEXIS 186799, at *3–*5, 2012 WL 7180482 (D. Ariz. Sept. 17,

2012)(in failure to protect negligence case, expert testimony was required because

"[p]rison operations are outside the common knowledge of the average juror.");

*Villalobos v. Bd. of County Comm'rs*, 322 P.3d 439, 442 (N.M. Ct. App. 2014)

(holding that expert testimony was required to assist the jury in rendering a

decision on the standard of care imposed on prison officials monitoring inmates in

negligence case brought by prisoner who was assaulted and raped by three other

inmates); *Seawright v. State*, 2013 WL 4430928, at *1 (D. Ariz. Aug. 16, 2013)

(noting that the plaintiff conceded "that the law in Arizona requires an expert

witness to establish the standard of care" for a gross negligence and wrongful

death claim brought against prison officials for failing to protect inmate from

attack by other inmates).

The Court finds these cases persuasive.  In the instant case, Mr. Hall seeks

to establish that Defendants were negligence by failing to institute policies that

separate rival STG members, adopting policies of housing rival STG members

together in close-custody, adopting policies of housing inmates with disciplinary

and behavioral problems together in CCMP with inmates who had no behavioral

or management problems, for placing Mr. Hall on CCMP without making adjustments to reduce the excessive risk of danger to him, for failing to train, supervise correctional staff, for failing to follow operation policies, and for communicating to inmates that Mr. Hall was a shot-call for the Northerners.  (2nd Amd. Cmplt., Doc.66 at 19-21.)

Some negligence claims against prison officials may not require expert testimony, but here Mr. Hall seeks to challenge the propriety of Defendants' housing policies, the policies and practices for selecting housing assignments for inmates, particularly STG inmates, the rationale of dealing with STG inmates, the implementation of the CCMP program, the movement of inmates, and investigating STG issues.  These claims involve issues outside the common understanding of jurors.  The prison operation being attacked by Mr. Hall here is a system designed to house a large number of inmates of differing characteristics while balancing the interests of a particular inmate's physical safety and well-being with the safety of correctional officers and other inmates in the facility. These factual issues are sufficiently beyond the common experience of the trier of fact.  Therefore, expert testimony would be required to assist the jury in understanding the appropriate standards of care.

In a situation where expert testimony is required to prove a plaintiff's

negligence claim, but the plaintiff does not present expert testimony, summary judgment dismissing the claim is warranted.  *Dubiel*, 272 P.3d at 70.  This case differs somewhat from *Dubiel* in that there was no expert disclosure deadline in this case and Defendants apparently did not ask for the identity of Mr. Hall's experts in discovery as they did not conduct discovery (Mtn for Sanctions, Doc. 103 at 2.)  Nevertheless, the party bringing a motion for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).  In this case, Defendants pointed to the absence of expert testimony to support Mr. Hall's state law negligence claims. This shifted the burden to Mr. Hall to produce evidence sufficient to support a jury verdict in his favor.  *Deveraux*, 263 F.3d at 1076.  Because Mr. Hall has not presented any such expert testimony, Defendants are entitled to summary judgment on his negligence claims.

## II.  NON-DISPOSITIVE MOTIONS

In light of the above findings Mr. Hall's Motion to Compel Discovery (Doc.

82); Defendants' Motion for Protective Order (Doc. 91); Mr. Hall's "Motion for an Order upon Defendants to Comply with Rule 33(b)(3) and (5), Fed.R.Civ.P. on the Matter of Supplemental Answers to Their Interrogatories" (Doc. 131); Mr. Hall's "Request for Magistrate Judge's Instruction Related to Evidence Used in Support of Opposition Brief to Defendants' Motion for Summary Judgment" (Doc. 134); and Mr. Hall's Motion to Strike Portions of Defendants' Reply on Motion for Summary Judgment (Doc. 145) will be denied as moot.  As set forth above, the Court bases its summary judgment ruling on Mr. Hall's own admissions that he was safely housed with Sureno inmates in F block and therefore moving him to another locked housing unit was not deliberately indifferent.  Even if the evidence Mr. Hall seeks in his motion to compel was available and discoverable, it would not change this analysis.  Rule 56(d) requires a party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment.  *Emp'rs Teamsters Local*, 353 F.3d at 1129-30.  As set forth above, even if there were multiple incidents of gang violence in the months leading up to the incident, even if the Sureno inmates in CCMP had significant disciplinary records and even if there were several Sureno inmates in CCMP on November 16, 2011, it would not change the fact that Mr. Hall was simply moved from one locked housing unit to another locked housing unit.

41

Defendants also filed a Motion to File Exhibit 46 under Seal (Doc. 142) in support of their reply brief.  As set forth in footnotes 2 and 5, the Court did not consider the new evidence presented in Defendants' reply because Mr. Hall did not have an opportunity to respond.  *See Provenz v. Miller,* 102 F.3d 1479, 1483 (9th Cir. 1996)(new evidence in reply may not be considered without giving the non-movant an opportunity to respond).  As such, the motion to seal will be denied.

## III.  MOTION FOR SANCTIONS

Mr. Hall seeks sanctions based upon Defendants' failure to attend a court ordered mediation in good faith and Defendants' discovery practices.

Defendants argue that the motion should be denied because Mr. Hall committed a serious breach of the confidentiality of the mediation process and his allegations lack a factual basis and do not even assert bad faith.  They contend that the Court should decline to breach the confidentiality of the settlement conference based on nothing more than Mr. Hall's speculation.

The timing of events in this case is important to the analysis of Defendants' motion.  By Order dated August 17, 2015, the Court required discovery to be completed on or before October 19, 2015 and motions to be filed by November 13, 2015.  (Doc. 59.)  On September 22, 2015, Defendants filed a motion to stay

42

discovery arguing that they planned to file a motion for summary judgment on the basis of qualified immunity. (Doc. 62.) The Court denied the motion on September 23, 2015. (Doc. 64.) On November 5, 2015, without serving Mr. Hall with any discovery (Mtn for Sanctions, Doc. 103 at 2) and just eight days before the motions deadline, Defendants filed a motion for a settlement conference. In that motion, Defendants specifically requested the appointment of Tim Line, Law Clerk to United States Magistrate Judge Lynch for the limited purpose of conducting a formal settlement conference at Montana State Prison. Defendants represented that they were willing to transport Mr. Hall from South Dakota to MSP for the purposes of mediation. In addition, Defendants asked that the Court continue all deadlines for filing pretrial motions and the proposed pre-trial order pending the settlement conference. (Doc. 75.) On November 12, 2015, Hall delivered into the prison legal mail system his objection to Defendants' motion for a settlement conference, expressing in part concern that the motion was being taken as a diversionary delay tactic during discovery. (Doc. 78.) The Court granted Defendants' motion prior to receipt of Mr. Hall's objection. (Doc. 77.)

As requested by Defendants, the Court appointed Tim Line to act as a mediator. For reasons not apparent to the Court, Mr. Line traveled (at the Court's expense) to South Dakota where Mr. Hall was incarcerated to conduct the

mediation.  The Court takes judicial notice of Court records showing that Mr.

Line's traveling expenses totaled $1,166.70.  In addition, Mr. Line spent three

days away from his other business with the Court.

Mr. Hall contends that during the settlement conference, he was pressed to

present his case and produce evidence to the mediator.  When asked for a

settlement offer, Mr. Hall indicated that his demand was contained in his

Complaint.  (Hall Aff., Doc. 103-1 at 7, ¶ 19.)  In response, Defendants refused to

make a settlement offer, other than demanding that Mr. Hall simply dismiss his

case.  (Hall Aff., Doc. 103-1 at 7, ¶ 20.)

Defendants argue that the motion for sanctions should be denied because

Mr. Hall disclosed confidential mediation communications.  In his motion, Mr.

Hall merely indicated that he was pressed to present his case, his theory of the

case, and his evidence to the mediator and that Defendants refused to make a

settlement offer.  (Doc. 103.)  No information regarding the merits of the case,

comments by Mr. Line, or comments by opposing counsel were disclosed.  In

contrast, in the Second Circuit case cited by Defendants, the appellee cited to a

statement made by the Circuit Court's staff regarding the merits of the appeal in

their request for attorneys' fee.  *Lake Utopia Paper Ltd. v. Connelly Containers,*

*Inc.*, 608 F.2d 928 at 929 (2nd Cir. 1979).  In denying the request for damages and

44

costs, the Second Circuit stated, "In bringing to our attention a comment made by Staff Counsel about the merits of this appeal, appellee's counsel has committed a serious breach of the confidentiality essential to the purposes of pre-argument conferences." *Id.* at 930.

In the other case cited by Defendants, it is not clear what confidential communications were disclosed in seeking damages for the alleged failure to act in good faith at a mediation.  *See Hamlett v. Gonzales*, 2005 U.S. Dist. Lexis 41691, 2005 WL 1500819 (N.D. Tex. 2005.)

Mr. Hall did not disclose confidential communications.  There is authority allowing the disclosure of information from settlement negotiations for the purposes of determining a lack of good faith.  *See In re Young*, 253 F.3d 926, 927 (7th Cir. 2001) ("Although settlement negotiations are of course confidential for most purposes, their contents may be revealed insofar as necessary for the decision of an issue of alleged misconduct in them.").  The information Mr. Hall disclosed was limited to whether or not a settlement offer was made which was necessary for determining whether Defendants participated in bad faith.

Next, Defendants argue the Court cannot sanction a party for refusing to make a settlement offer.  There is no dispute that a court may not force a party to settle.  But the instant inquiry is not whether the parties settled, or did not settle,

but procedurally whether Defendants failed to participate in good faith during the mediation.  A settlement conference in federal court involves a significant amount of time and resources on behalf of the parties and the Court.  Particularly in this case where a Court employee was acting a mediator and had to travel out of state to facilitate that mediation.  As such, if a party intends not to meaningfully participate, it has an obligation to inform the opposing party and the Court.  A settlement conference is not intended to be a futile exercise.  "[I]f a party has no intention of settling, and therefore cannot participate in settlement discussions in good faith, they have an obligation to inform the Court as soon as practically possible."  *Hansen v. State Farm Mut. Auto. Co.*, 2013 WL 1385639, at *1 (D. Nev. Apr. 3, 2013); *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320 (5th Cir. 1996) (affirming sanctions award because a party's failure to warn that it did not intend to settle before a settlement conference violated the "good faith" participation requirement of Federal Rule 16); *cf. Dawson v. U.S.*, 68 F.3d 886, 897–98 (5th Cir. 1995) (reversing a sanctions award because the trial court effectively-and incorrectly-made a settlement offer part of the requirement that the parties engage in good faith settlement efforts).

Here, Defendants requested the settlement conference.  (Doc. 75.)  In making the motion for settlement conference, which Mr. Hall opposed, Defendants

46

did not communicate that they were not going to make a settlement offer at the mediation.  (Doc. 75.)  Defendants' failure to notify Mr. Hall, the Court, or Mr. Line prior to the mediation that they did not intend to make any settlement offers unnecessarily expended "limited time, financial resources [,] and energies of the Court" and Mr. Hall.  *Pitman v. Brinker Intern., Inc.*, 216 F.R.D. 481, 486-87 (D.Ariz. 2003).

Another revealing indication that Defendants sought and attended the Settlement Conference in less than good faith was the timing of their motion. Defendants' motion for settlement conference was made just eight days before the deadlines for filing pretrial motions and they requested that the Court continue that deadline pending the settlement conference.  (Doc. 75.)  Further, as represented by Mr. Hall, Defendants had not conducted any discovery prior to the discovery deadline.  (Doc. 103 at 2.)  Mr. Hall's argument that the request for a settlement conference was simply a delay tactic is well-taken.

Lastly, in their response to Mr. Hall's motion for sanctions Defendants provide no justification for requesting a settlement conference and then refusing to make an offer.  Without any defense on the issue, the only conclusion can be that Defendants were not prepared to participate in good faith at the settlement conference.  *See Hansen*, 2013 WL 1385639, at *3 (sanctioning counsel who

"could not have been prepared to participate in good faith, because he knew his client would not settle the case before the settlement conference even began").

There may have been good reasons to not make a settlement offer in this case. As set forth above, the Court recommends that Defendants' motion for summary judgment be granted and this case dismissed. It is not however, just the failure to make an offer that justifies sanctions. It is the practice of requesting a settlement conference involving a Court employee when there was no intention to make an offer.

The Court warned the parties that a failure to negotiate in good faith may result in the impositions of sanctions and/or costs of the conference. (Doc. 77 at 3.) Defendants will be required to pay the Court's costs in having Mr. Line attend the settlement conference.

Based upon the foregoing, the Court issues the following:

## ORDER

1. Plaintiff's Motion to Compel (Doc. 82) is DENIED AS MOOT.

2. Defendants' Motion for Protective Order (Doc. 91) is DENIED AS MOOT.

3. Plaintiff's Motion for Sanctions (Doc. 103) is GRANTED. Defendants shall be required to reimburse the Court for Mr. Line's travel expenses to South

Dakota in the amount of $1,166.70.

4.  Plaintiff's Motion to Compel Supplemental Responses (Doc. 131) is DENIED AS MOOT.

5.  Plaintiff's Motion for Instruction (Doc. 134) is DENIED AS MOOT.

6.  Defendants' Motion for Leave to File Exhibit under Seal is DENIED.

7.  Plaintiff's Motion to Strike Portions of Defendants' Reply on Motion for Summary Judgment (Doc. 145) is DENIED AS MOOT.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Motion for Summary Judgment (Doc. 111) should be GRANTED and this matter DISMISSED.  The Clerk of Court should be directed to close the case and enter judgment in favor of Defendant pursuant to Rule 58 of the Federal Rules of Civil Procedure.

2.  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.  No reasonable person could suppose an appeal would have merit.

**NOTICE OF RIGHT TO OBJECT TO FINDINGS &**
**RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT**

The parties may file objections to these Findings and Recommendations

within fourteen (14) days after service (mailing) hereof.[7]  28 U.S.C. § 636.  Failure

to timely file written objections may bar a de novo determination by the district

judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of

Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed

until entry of the District Court's final judgment.

DATED this 31st day of July, 2017.


___*/s/ John Johnston*_____
John Johnston
United States Magistrate

---

[7]As this deadline allows a party to act after the Findings and Recommendations is
"served," it falls under Fed.R.Civ.P. 6(d).  Therefore, three (3) days are added after the period
would otherwise expire.